IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ADA WILSON, and THE ESTATE OF JOSEPH WILSON, | CASE NO. 8:04CV640 |
| Plaintiffs, | |
| vs. | MEMORANDUM AND ORDER |
| BEL FURY INVESTMENTS GROUP, LLC, and SCOTT W. BLOEMER, | |
| Defendants. | |

This matter is before the Court on the cross-motions for partial summary judgment. The Plaintiffs, Ada Wilson ("Ada"), and the estate of her husband, Joseph Wilson,[1] entered into a transaction with Defendant Bel Fury Investments Group, LLC ("Bel Fury"). Defendant Scott W. Bloemer is the majority owner of Bel Fury, and the only representative of Bel Fury who conducts negotiations relating to Bel Fury's foreclosure assistance program.

Ada Wilson filed a motion for partial summary judgment asking the Court to determine that The Truth in Lending Act, as amended by the Home Ownership and Equity Protection Act, codified at 15 U.S.C. §1601 *et seq.* (collectively "TILA"), applies to the transaction between her and the Defendants; to find that the Defendants failed to comply with TILA's mandatory disclosure requirements; to rescind the contract between the parties; and to re-convey the warranty deed to the Plaintiffs.

The Defendants also filed a motion seeking summary judgment against the Plaintiffs on their claims arising under TILA. The Defendants contend that TILA does not apply to the transaction between the Wilsons and Bel Fury. The Defendants also contend that the

---

[1] Joseph Wilson died in September 2004.

Plaintiffs have failed to show a basis for individual liability against Bloemer, and that the Plaintiffs have failed to plead fraud with sufficient particularity. The Defendants' motion was not supported with a brief, although the Defendants filed a reply brief to which the Plaintiffs object.

## Undisputed Facts

In July 1995, Ada and Joseph Wilson purchased a home on Elm Street in Omaha for $74,950. Also in July 1995, Commercial Federal Bank ("Commercial") loaned the Wilsons approximately $75,000, securing the loan with a mortgage on the Elm Street property. The Wilsons made mortgage payments of $527 per month. (Filing No. 49,[2] Ada Wilson Dec. ¶¶ 4, 5).

After the Wilsons missed several monthly payments, Commercial commenced foreclosure proceedings. The Wilsons were notified that the property would be the subject of a trustee's sale scheduled for December 30, 2003. (*Id.* at ¶7). At the time of the sale, the Wilsons believed, based on their knowledge of the sale price of other homes in their

---

[2] The Defendants' objection to the Plaintiffs' original index of evidence is well-taken. Contrary to the Plaintiffs' characterization of the objections as "formalities," the rules requiring proper foundation and authentication of documents are crucial to ensuring the fairness and integrity of the summary judgment procedure. (See Filing No. 48, n.1) Absent compliance, the Court must disregard the proposed evidence.

> "To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed.R.Civ.P. 56(e). Documents which do not meet those requirements cannot be considered." (*quoting Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635-36 n. 20 (8th Cir.2000)).

*Shanklin v. Fitzgerald,* 397 F.3d 596, 602 (8th Cir. 2005). In this case, the Plaintiffs have filed an Amended Index of Evidence at Filing No. 49 that addresses the authentication requirement, and I note that the depositions provide sufficient foundation for the transaction documents. In the interests of securing the just, speedy and inexpensive determination of this action, I will accept as evidence the documents attached to the Amended Index of Evidence. (Fed. R. Civ. P. 1). All references to the Plaintiffs' evidence will be to that evidence submitted with Filing No. 49.

neighborhood, that their Elm Street property had a fair market value of approximately $100,000. In September 2004, the property was appraised at $105,000.

The parties agree that before the date of the trustee sale, Bloemer came to the Wilsons' house. Ada states that Bloemer identified himself as an appraiser for Commercial Federal Bank, and told the Wilsons that they could "avoid foreclosure." Bloemer denies that he associated himself with the bank, and states that he told the Wilsons that he was considering the purchase of their house at the trustee sale. Ada told Bloemer that she wanted to keep her house. Bloemer offered the Wilsons what he termed "assistance" through a foreclosure assistance program used by Bel Fury in the past. He represented that his company, Bel Fury Investments, would pay the Wilsons' obligation to Commercial Federal Bank, hold the deed, permit the Wilsons to continue to reside in the house pursuant to a rental agreement, and that the Wilsons would have an opportunity to repurchase the house if they wished to do so.[3]

The Plaintiffs and Defendants agree that they entered into a transaction. Although the Wilsons signed several documents, the parties agree that they were all part of the same transaction. (Wilson Dec. ¶15; Bloemer Dep. 40:9-20, 117.) The documents include a Purchase Agreement; Addendum to Purchase Agreement; Addendum #2; Addendum #3; Warranty Deed; and Rental Agreement. (Filing No. 49, Amended Index of Evidence, Virgil Affidavit, Exs. A5 - A 10.) The Defendants apparently do not dispute the fact that disclosures required by TILA were not made in connection with the Wilson transaction.

---

[3] According to Ada, the Defendants also were to arrange financing for the Wilsons' repurchase of their house, but Bloemer denies that financing of the repurchase was part of the transaction.

The Plaintiffs have submitted evidence that the Wilsons' transaction with Bel Fury was much like another transaction between Bel Fury and Colleen Kacin, and that the Kacin transaction was concluded in the same 12-month period as the Wilson transaction.

The Plaintiffs contend that their transaction constituted an extension of consumer credit covered by TILA, and that the Defendants were required by law to make certain disclosures with regard to annual percentage rates and financing charges, and that the Defendants failed to do so. Because of these failures, the Wilsons submitted a demand for rescission to Bel Fury, which Bel Fury rejected. The Plaintiffs seek rescission of the transaction and the re-onveyance of the deed to Ada. Defendants maintain that the transaction was not covered by TILA and that disclosures were not required. The Defendants maintain that Bel Fury is the rightful owner of the Elm Street property. Resolution of the case will depend, in part, on the character of the parties' transaction.

**Summary Judgment Standard**

Both parties have moved for partial summary judgment. Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Nuzum v. Ozark Automotive Distributors, Inc.*, 432 F.3d 839, 842 (8th Cir. 2005). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324-25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (citations omitted). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327.

## Analysis

**TILA Creditors Must Regularly Extend Credit**

I turn first to the Plaintiffs' motion. The Plaintiffs contend that the Wilsons were consumers and that credit was extended to them by the Defendants. The Plaintiffs argue that the Defendants fit within the statutory definition of "creditor" found in §1602(f) because Bel Fury and Bloemer originated more than one mortgage as defined in 15 U.S.C. § 1602(aa) in a one-year period. The Defendants argue that the Plaintiffs misstate the statutory requirements of § 1602(f), and that the Defendants are not TILA creditors

5

because they have not "regularly extended" "consumer credit" as those terms are used in the Act. While I conclude that the statutory definition of "creditor" is more complex than the Plaintiffs' argument recognizes, it is not this complexity in the law that requires me to deny the Plaintiffs' pending motions, but rather it is the existence of genuine issues of material fact relating to the parties' intent.

"Creditor" is defined as:

(f) The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.
. . .

15 U.S.C. § 1602(f) (emphasis added).[4] In 1994, a final sentence was added to the definition by the Homeownership and Equity Protection Act, which brought certain high-cost mortgage transactions under TILA coverage.[5] The final sentence states:

Any person who originates 2 or more mortgages referred to in subsection (aa) of this section in any 12-month period or any person who originates 1

---

[4] The omitted language relates to open credit and credit card transactions that are not relevant to this matter.

[5] The legislation history includes the following:

[T]he Conferees believe that these loan structures are potentially dangerous when misused and warrant a heightened degree of consumer protection in order to ensure that borrowers are not victimized by abusive lending practices. The bill amends the Truth in Lending Act (TILA) to define a class of non-purchase or non-construction loans with high interest rates or up-front fees. To ensure that consumers understand the terms of such loans and are protected from high pressure sales tactics, the legislation requires creditors making such loans to provide a special, streamlined disclosure three days before consummation of the transaction, in addition to the other disclosures required by the TILA.

H.R. Conf. Report 103-652; 1994 U.S. Code Cong Admin. News 1977, 1988.

6

> or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this subchapter.

The final sentence is not a stand-alone definition of creditor as the Plaintiffs contend, but simply expands the definition of creditor to include certain other persons, including persons who originate mortgages described in § 1602(aa), provided that they originate at least two such mortgages in a twelve-month period. The Defendants argue that the 1994 amendment to 1602(f) does not obviate the two-part test for creditor identified in the federal regulations relating to TILA, known as Regulation Z. I agree. The two-part test for "creditor" is set forth below:

> (17) Creditor means:
>
> (i) A person (A) who regularly extends consumer credit [n. 3] that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

12 C.F.R. § 226.2 (a)(17); *see also* Federal Reserve System Official Interpretation, 12 C.F.R. § 226.1, Supp. 1, p. 363 (acknowledging that the two part test must be satisfied even after the 1994 amendment).[6] Footnote 3 to 12 C.F.R. § 226.2(a)(17) provides guidance on the first part of the test and the meaning of "regularly extends." Footnote 3 states:

> A person regularly extends consumer credit only if it extended credit (other than credit subject to the requirements of § 226.32) more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 226.32 or one or more such credit extensions through a mortgage broker.

---

[6] See *Ford Motor Credit Co. v. Milhollin* 444 U.S. 555, 565 (1980)(encouraging deference and attentiveness to the Federal Reserve Board's interpretation).

7

12 C.F.R. § 226.2 (17), n. 3.  *See also Viernes v. Executive Mortgage, Inc.,* 372 F. Supp. 2d 576, 582 (D. Hawaii 2004).

Therefore, the Plaintiffs can establish that Bel Fury is a creditor under TILA if it

1) originated at least two mortgages referred to in § 1602(aa) in a 12-month period that were payable by agreement in more than four installments or for which the payment of a finance charge was or could have been required, and

2) the Defendants were the person to whom the debt was initially payable.

**Wilson and Kacin Transactions as Subsection (aa) Mortgages**

The Plaintiffs contend that the Wilson and Kacin transactions with the Defendants are mortgages referred to in § 1602(aa), and for that reason the Defendants are creditors under TILA.  The Defendants argue that the transactions were sales, not mortgages and not any other type of extension of consumer credit.  (Bloemer Dep. at 66-67).

Whether the Wilson and Kacin transactions with the Defendants are § 1602(aa) mortgages is guided by statutory definition and state law. Section 1602(aa) states:

> (1) A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if--
>
> (A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or
>
> (B) the total points and fees payable by the consumer at or before closing will exceed the greater of--
> (I) 8 percent of the total loan amount; or
> (ii) $400

8

15 U.S.C. § 1602(aa).  To determine whether a transactions is secured by a dwelling, federal courts have looked to state law.  *See* 12 C.F.R. § 226.2(a)(25) ("Security interest means an interest in property that secures performance of a consumer credit obligation and that is recognized by State or Federal law. . . . ").  *See also Hruby v. Larsen*, 2005 WL 1540130, 2, and n. 5 (D.Minn. 2005) and cases cited therein.

Nebraska Revised Statute § 76-251 (Reissue 1996) states that "[e]very deed conveying real estate, which, by any other instrument in writing, shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage."  The Nebraska Supreme Court has stated that "a mortgage is created by the voluntary act of the parties" and has defined a mortgage as "a contract by which specific real property capable of being transferred is hypothecated for the performance of an act without requiring a change in possession and includes a transfer of an interest in real property made only to secure the performance of an act."  *Tilt-Up Concrete, Inc. v. Star City/Federal, Inc.,* 621 N.W.2d 502, 510 (Neb. 2001) citing *Wagner v. Wagner*, 612 N.W.2d 555 (N.D. 2000).

I conclude that Nebraska law recognizes that the form of the documents will not dictate the character of the transaction.  Thus, a warranty deed, purchase agreement, and rental agreement, such as are presented in this case, may constitute a mortgage rather than an absolute conveyance based on the intention of the parties as established by all the facts and circumstances surrounding the transactions.[7]   *Id.*   *See also Sorber v. Brumbaugh,* WL 612775, 3-5  (Neb. App. 2004) citing *Campbell v. Ohio National Life Ins.*

---

[7] This principle is long-standing.  "A Court of equity looks at the real object and intention of the conveyances; and when the grantor applies to redeem, upon an allegation that the deed was intended as a security for a debt, that Court treats it precisely as it would an ordinary mortgage, provided the truth of the allegation is made out by the evidence." *Hughes v. Edwards*, 22 U.S. 489, 495 (1824).

*Co.*, 74 N.W.2d 546 (Neb. 1956); *Morrow v. Jones*, 60 N.W. 369 (Neb. 1894); and *Kemp v. Small*, 49 N.W. 169 (Neb. 1891) (acknowledging that the Nebraska Supreme Court has held, in those cases where the grantor and grantee in the absolute deed were also the debtor and creditor with regard to the mortgage at issue, that an absolute deed was in effect a mortgage secured by the property to which the deed referred based on the parties' intent).

Congress's decision to include high-cost mortgages under TILA's coverage also demonstrates that consumer credit can be extended through non-conventional mortgages. Section 1602(h) states that the "consumer" when "used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property or services which are the subject of the transaction are primarily for personal, family, or household purposes." "Credit" is defined by TILA as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." § 1602(e). Based on these definitions, an extension of consumer credit certainly could be made though a high-cost mortgage as defined in 15 U.S.C. § 1602(aa).

The Plaintiffs argue that the undisputed facts demonstrate that this transaction and the Kacin transaction qualify as mortgages under §1602(aa). The Defendants resist the entire analysis by maintaining that the transactions were absolute sales; that the Defendants did not retain a security interest because they owned the properties; and that the Defendants did not extend consumer credit through these two transactions.

All parties rely, in part, on the transaction documents in support of their arguments. I focus here on the Wilson transaction, though a similar summary could be provided relative to the Kacin transaction. The Wilsons' transaction documents reveal that the

10

Warranty Deed transferred the Elm Street property from the Wilsons to Bel Fury in consideration of $2. (Ex. A9.)  The Purchase Agreement and addenda provided, in part, that Bel Fury would stop the foreclosure sale scheduled for December 30, 2003, by reinstating the existing note between the Wilsons and Commercial Federal Bank; that the Wilsons were granted continued right of occupancy for one year subject to the payment of $885 monthly made pursuant to the written lease; and that the Wilsons had the right of first refusal to repurchase at set purchase prices under certain conditions.  (Exs. A5-8.) The Rental Agreement provided that the Wilsons would pay rent in the amount of $10,620 in twelve monthly installments of $885 each, and that if the lease were terminated before the expiration of the original 12-month term, then the Wilsons would owe Bel Fury a "10 % cancellation fee of the total annual which is equal to $1062.00 . . ." (Ex. A10.)

The Plaintiffs contend that several facts establish that the Wilson transaction constituted an extension of consumer credit secured by a dwelling as is required in § 1602(aa).  First, Ada testified that she believed the transfer of the Warranty Deed was part of a loan agreement.  (Wilson 43, 56-64). The transaction was structured such that the Wilsons were to perform all maintenance on the house; they were to keep insurance on the house; they remained in the home; Commercial Federal Bank recognized them as Trustees of the property for several months after the transaction with Bel Fury was concluded; there was inadequacy of consideration for the so-called sale; and the repurchase price was based on the amount of credit extended to the Wilsons and not on the value of the property.  The Plaintiffs also filed the affidavit of Dr. Luis Garcia-Feijoo, who holds a Ph.D. in finance, in support of their motion.  Dr. Garcia-Feijoo stated that the Wilson transaction appeared to him to be structured as a sale, lease-back of an asset, which is a typical financing agreement.  He also stated that the annual percentage rates

11

that applied to the transaction ranged from 12.6 to 19.2. (Ex. A-11). The Plaintiffs contends that these facts demonstrate that the transaction was an extension of consumer credit if the form of a "high cost" mortgage under § 1602(aa).

The Defendants rely on the deposition and affidavit testimony of Scott Bloemer and the transaction documents, which I note were prepared by Bloemer, to show that the transaction was not an extension of consumer credit by Bel Fury to the Wilsons. The documents are entitled "Warranty Deed," "Purchase Agreement" and "Rental Agreement," and the Wilsons are identified as "Sellers" and "Tenants" and Bel Fury is identified as "Purchaser" and "Landlord." Bloemer stated that Bel Fury was not "extending credit to the consumer, [but r]ather Defendants purchase distressed real estate as an investment to rehabilitate the property and resell it." (Filing No. 36, Bloemer Dep. 14). He explained that through Bel Fury's foreclosure assistance program, Bel Fury purchased real estate from the owner prior to the foreclosure sale, stopped the foreclosure, and allowed the prior owners to rent the home back from Bel Fury. Defendants then allowed the prior owners to repurchase the home for a set price that was based on the amount of money and the length of time that Bel Fury had its capital tied up in the transaction, and the cost to Bel Fury of foregoing other investment opportunities that Bel Fury could otherwise have made. Bloemer stated that "we're not in the lending business" and denied that the Defendants make loans. (Bloemer Dep. 130:9-22.) When asked about the 10 percent cancellation fee of $1,062 referenced in the Wilson's Rental Agreement, Bloemer explained the high fee by characterizing it as one month's rent plus a $207 cancellation fee – even though I note that breakdown is not contained in the transaction documents. Bloemer stated in his affidavit that he "patiently, carefully and thoroughly" explained the transaction to the

12

Wilsons, and that he never told the Wilsons that he was a lender or that they would have any relationship to their residence after the transaction except as tenants. (Filing No. 42.)

Whether a transaction constitutes an extension of credit secured by a dwelling, a typical financing arrangement, or an absolute conveyance is determined by all the circumstances surrounding the transaction. Where the parties intend to create a mortgage, even though the documents indicate that it is a sale of real property and lease-back transaction, a mortgage is created.

An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Because I cannot conclude that no reasonable juror could find for the Defendants, I am compelled to deny the Plaintiffs' motion for summary judgment.

Because there are genuine issues regarding the parties' intent, I also deny the Defendants' motion for summary judgment on the TILA claims. The Plaintiffs argue that the Defendants' motion for partial summary judgment should be denied based on their failure to comply with the rules of the Court. The Defendants did not file a separate brief in support of their motion, and instead, they relied on their "Statement of Material Controverted Facts" contained in the Defendants' brief in opposition to the Plaintiffs' motion for partial summary judgment. (Filing No. 44, p.2.) I agree with the Plaintiffs that the Defendants' reference to controverted facts in another brief does not satisfy the requirement of providing a statement of undisputed facts upon which they believe they are entitled to summary judgment. Moreover, the portions of Defendants' motion seeking

13

dismissal of Bloemer and of the Plaintiffs' fraud claim present significant legal issues that required briefing under the local rules. The Defendants will not be allowed to substitute a reply brief for a brief in support of their motion. The Plaintiffs' objection to the reply brief is well-taken, and the Defendants' reply brief was not considered. Accordingly, the portions of the Defendants' motion relating to the dismissal of Bloemer and the fraud claim will be denied based on the Defendants' failure to comply with Fed. R. Civ. P. 56 and NECivR. 56.1(a).

Although the Defendants' motion for summary judgment on the Plaintiffs' fraud claim is not granted, it appears that the Plaintiffs' allegations at paragraphs 66-70 of the Complaint, including the attempt to reincorporate allegations contained in preceding paragraphs, are insufficient to satisfy the requirements of Fed. R. Civ. P. 9(b). To promote the efficient administration of justice, the Plaintiff is granted leave of the Court to file an Amended Complaint to state her fraud claim with sufficient particularity.

### Conclusion

At the summary judgment stage, this Court may not weigh evidence and may not evaluate the credibility of parties or witnesses. The Defendants have submitted sufficient evidence demonstrating that there are genuine issues of material fact remaining regarding the parties' intentions when entering into their transaction. For this reason, and based on the Defendants' failure to follow the rules of the court, the motions for partial summary judgment are denied.

IT IS ORDERED:

1. Plaintiffs' Motion for Partial Summary Judgment (Filing No. 34) is denied;

2. Defendants' Motion for Partial Summary Judgment (Filing No. 44) is denied;

3. Plaintiffs' Objection to the Defendants' Reply Brief (Filing No. 54) is sustained; and

4. Plaintiff is granted leave to file an Amended Complaint that states a claim for fraud with the particularity required by Fed. R. Civ. P. 9(b). The Amended Complaint must be filed on or before February 15, 2006, or the fraud claim will be subject to dismissal.

Dated this 6th day of February, 2006.

                                          BY THE COURT:

                                          s/Laurie Smith Camp
                                          United States District Judge